# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CT-00108-SCT

*KENNETH BROWN*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT:               12/10/2004
TRIAL JUDGE:                    HON. BETTY W. SANDERS
COURT FROM WHICH APPEALED:      WASHINGTON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         PHILLIP BROADHEAD
ATTORNEYS FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                                BY: DEIRDRE McCRORY
DISTRICT ATTORNEY:              JOYCE I. CHILES
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    THE JUDGMENT OF THE COURT OF
                                APPEALS IS REVERSED. THE JUDGMENT
                                OF THE CIRCUIT COURT OF
                                WASHINGTON COUNTY IS REVERSED
                                AND REMANDED - 06/26/2008
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC**.

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     This is a conviction for aggravated assault and shooting into a dwelling house. During closing argument, the prosecutor repeatedly suggested to the jury that it should return a verdict of guilty for reasons other than that the defendant in this case was actually guilty. On one such occasion, after defense counsel's objection was sustained, the prosecutor argued with the trial judge, falsely representing to her that every decision from this Court allowed him to make "send-a-message" arguments to the jury.

¶2. The jury returned a guilty verdict, and the defendant appealed. We referred the matter to the Court of Appeals, which affirmed the conviction but ordered the prosecutor to pay the costs of appeal. *Brown v. State*, 2006 Miss. App. LEXIS 924 (Miss. Ct. App. Dec. 12, 2006). The State filed a petition for writ of certiorari to review the Court of Appeals' decision to assess the costs of the appeal to the prosecutor. We granted the State's petition and, pursuant to our authority to review all issues raised in the Court of Appeals,[1] we now reverse the conviction and the assessment of costs against the prosecutor.

## BACKGROUND FACTS AND PROCEEDINGS

¶3. We borrow and restate here the Court of Appeals' excellent statement of the facts in this case:

> On May 2, 2003, at approximately 8:00 p.m., Earnest Moore and Latoya Carter were inside their bedroom at 115 West Second Street, in Leland, when they heard noises from outside. Carter went to make sure the front door was locked. Meanwhile, Moore was shot in the left hand as a shot was fired into his bedroom window from outside.
>
> At trial, Carter testified that she looked out the hall window on the night of the shooting and saw that it was Brown standing outside of their bedroom window with something silver in his hand. She said that she told Moore that it was Brown and to get out of the room. In her first statement to the police, there was no mention that she ever looked out of the window and saw the perpetrator at all. It was not until her second police statement that Carter said that she saw Brown. Carter testified that she and Moore both told police that same night that it was Brown.

---

[1]"The Supreme Court's review on the grant of *certiorari* shall be conducted on the record and briefs previously filed in the Court of Appeals, and on any supplemental briefs filed. The Supreme Court *may* limit the question on review." Miss. R. App. P. 17(h) (emphasis added). *See also* **Pub. Employees Ret. Sys. of Miss. v. Hawkins**, 781 So. 2d 899, 900-01 (Miss 2001) (Supreme Court not limited to review of issues raised on appeal); **McDaniel v. Ritter**, 556 So. 2d 303, 306-07 (Miss. 1989) ("Our appellate jurisdiction extends to cases and not just issues. . . . Moreover, once a case becomes subject to our appellate jurisdiction, we have authority to address all matters as may appear in the interests of justice and economy. . . .").

The jury heard testimony that during the three weeks leading up to the shooting, Brown made threats against the household and was caught prowling outside. Moore's brother-in-law, Richard Chaney testified that Brown bragged that he had shot Moore and gotten away with it. However, Brown denied the crime and gave an alibi. The jury found him guilty.

*Brown v. State*, 2006 Miss. App. LEXIS 924 (Miss. Ct. App. Dec. 12, 2006).

¶4.     During closing argument, Assistant District Attorney Brad McCullouch's serial misconduct began when he urged the jurors to

> walk away from our oppression and prejudice and make the types of decisions that make us heroes and rid crime from our streets. You know, we always say something could have been done. I mean, have you heard that? Something could have been done. Something could have been done in the future. And the future is now. We get to do something about the crime in this county. It is [sic] epidemic proportion.

(Emphasis added). Brown's counsel objected. Immediately after the trial judge sustained the objection, McCullouch stated to the jury that

> There were small children that was [sic] in that house minutes before that shot. How many children are sleeping on the floor with their momma sleeping on the floor in Greenville and Leland?

(Emphasis added). Again, Brown's counsel objected. Responding to the objection, McCullouch stated to the trial judge:

> Judge, every Supreme Court opinion that I have read has said the latitude given to prosecutors in cross-examination, even to use that send a message argument, is proper because it is a broad latitude that we're supposed to have for a free flow of ideas, to make inferences on the – to zealously represent the State and the people of the state. I mean we just have – we have great latitude here. I am not saying anything improper in this argument.

(Emphasis added). Unconvinced by this inaccurate argument, the trial judge admonished McCullouch, instructing him not to use such tactics in her courtroom. Rather than respectfully apologizing, McCullouch stated, "I've done nothing improper. The judge in this

3

– I mean Your honor has said not in my courtroom, but the Supreme Court –."At this point, the trial judge interrupted the prosecutor, telling him that she was not attempting to enforce rules different from those which applied to all courts in the state.  McCullouch continued to argue with the trial judge:

| | |
|---|---|
| McCULLOUCH: | Your Honor, the Supreme Court has said – |
| COURT: | I heard you say that. |
| McCULLOUCH: | – over and over again – |
| COURT: | You don't have to tell me twice.  I heard you when you said it. |
| McCULLOUCH: | Then how can it be improper argument if the Supreme Court has said that it is proper? |
| COURT: | I don't agree with you that the Supreme Court has said that. . . . Let me say this straight up to you.  I have ruled. Step back from the bench, continue with your closing, or be seated.[2] |

¶5.     As he continued his closing argument, McCullouch next stated to the jury:  "Talk about witnesses lie.  His [the defendant's] liberty is at stake.  What about our liberty to walk the streets . . . ." (emphasis added).  Brown's attorney objected and, after hearing argument, the trial judge stated,

> The court is going to sustain it.  The court is going to caution you that we're not going to go into the crime in the United States, the FBI statistics, that Greenville is trying to get into the safe crime community.  We're not going there.

McCullouch continued:

---

[2]In recalling this incident during the hearing on post-trial motions, Judge Sanders stated, "I believe it is the first time in my career of almost 15 years on the bench that I have had to say to an attorney to step back from the bench."

These people have a right to feel safe in their home and not have to leave, not have to sleep on the floor. <u>We have a right</u> – they have a right. That woman in the next apartment has a right not to have to worry that her child is going to get hit by a bullet in our county.

(Emphasis added). Brown's attorney objected, and, again, the trial judge sustained.

¶6.     In winding down his closing argument, McCullouch told the jurors: "We stand up here trying our best to represent the people, the people of the State of Mississippi, from <u>crime that may happen</u> . . . . " (emphasis added). Brown's attorney objected, but before the trial judge could sustain the objection, McCullouch "withdrew" the inappropriate comment.[3]

¶7.     The jury found Brown guilty on both charges, and he was sentenced to concurrent terms of imprisonment of ten and five years, with one year to serve on each count, and the remainder suspended with five years supervised probation. Brown timely perfected an appeal which we referred to the Court of Appeals. Brown's issues on appeal were (1) that the verdict was against the overwhelming weight of the evidence, and (2) that McCullouch engaged in prosecutorial misconduct in his closing argument to the jury.

¶8.     The Court of Appeals affirmed the convictions and taxed the costs of the appeal to Washington County. As a sanction for his inappropriate conduct during closing argument, the Court of Appeals ordered McCullouch personally to reimburse Washington County for all costs of the appeal. The State filed a petition for writ of certiorari, which we granted.

---

[3]We also note that McCullouch made the following inaccurate and misleading statement to the jury: "[T]hink of the consequences of a vote of not guilty. The community says they voted him innocent. I mean, it might be not guilty, but what you're doing is saying he's innocent. That's what it means."

**ANALYSIS**

¶9. Because Brown's second assignment of error – that, due to McCullouch's misconduct during closing argument, the trial court should have granted a mistrial – is dispositive of the case, we will not address his first assignment of error. We also will address the Court of Appeals' order that requires McCullouch personally to reimburse Washington County for the costs of appeal.

**I.**

¶10. Justice Armis Hawkins once warned that a "rule which is not enforced is no rule." *Box v. State*, 437 So. 2d 19, 21 (Miss. 1983). While we agree with the spirit of Justice Hawkins's statement, we are not so intractable and inflexible that we believe every error and misstatement by a prosecutor during closing argument merits a mistrial. However, we have searched in vain for a case as egregious as the one before us today. McCullouch repeatedly was called down by the trial judge for blatantly violating the rule against making inappropriate statements to the jury, all the while lecturing the trial judge on the appropriateness of his objectionable comments. Furthermore, McCullouch brazenly misrepresented this Court's precedent to the trial judge.[4]

¶11. For two decades, this Court has warned prosecutors not to encourage juries to use their verdict to "send-a-message" to the public or to other potential criminals. While, hopefully, the threat of punishment serves as a deterrent to crime, it is the function of the jury

---

[4]As quoted from the record later in this opinion, the prosecutor stated to the trial judge that, in "every case" he has read, the "Supreme Court" has said "send-a-message" arguments are proper. Given that every case addressing the subject for the past twenty years states the opposite, it is fair to conclude that the prosecutor either read no cases, or was not telling the trial judge the truth.

in a particular case to render a verdict based solely on the evidence introduced at the trial of

that case. As this Court stated twenty years ago:

> The jurors are representatives of the community in one sense, but they are not to vote in a representative capacity. Each juror is to apply the law to the evidence and vote accordingly. The issue which each juror must resolve is not whether or not he or she wishes to "send a message" but whether or not he or she believes that the evidence showed the defendant to be guilty of the crime charged. The jury is an arm of the State but it is not an arm of the prosecution. The State includes both the prosecution and the accused. The function of the jury is to weigh the evidence and determine the facts. When the prosecution wishes to send a message they should employ Western Union. Mississippi jurors are not messenger boys.

***Williams v. State*** 522 So. 2d 201, 209 (Miss.1988).

¶12.   Depending upon the facts and circumstances of each case, "send-a-message"

arguments may – standing alone – constitute reversible error. ***Payton v. State***, 785 So. 2d

267, 271 (Miss. 1999). In ***Payton***,[5] this Court found the following "send-a-message"

statement to be reversible error:

> Send a message to these older, more mature, criminals, "We are not going to let you ruin young people's lives like you have ruined these three people's lives, and all these lives you endangered in the process."

***Id***. at 270.

¶13.   We recently addressed this issue in ***Spicer v. State***, 921 So. 2d 292 (Miss. 2006),[6] in

which we set forth two threshold inquiries, followed by a two-pronged test. The first

---

[5]*See also* ***Evans v. State***, 725 So. 2d 613, 675 (Miss. 1997); ***Wilcher v. State***, 697 So. 2d 1123, 1139 (Miss. 1997); ***Hunter v. State***, 684 So. 2d 625, 637 (Miss. 1996); ***Williams v. State***, 522 So. 2d 201, 209 (Miss. 1988).

[6]In ***Spicer***, the "send a message" statement made by the prosecutor was: "We can't keep you from doing it, but you will pay the price for doing it. And other people are going to know that you paid the price." ***Spicer***, 921 So. 2d, at 317. No objection was made to the comment, and it happened only once.

7

threshold question is whether defense counsel objected. We noted that, despite the absence of objection, we will not procedurally bar the issue where "the [send-a-message] argument is so 'inflammatory' that the trial judge should have objected on his own motion." *Id*. at 317 (internal citations omitted).

¶14. ***Spicer's*** second threshold inquiry is whether it appears, in examining the surrounding circumstances, that defense counsel invited the comment. *Id*. at 318. If so, of course, the issue may be waived.

¶15. Once the two threshold questions are satisfied, ***Spicer*** provides that, for a finding of reversible error, "the court must determine (1) whether the remarks were improper, and (2) if so, whether the remarks prejudicially affected the accused's rights." *Id*. (internal citations omitted). In attempting to clarify the application of the test, we stated that

> [i]t must be clear beyond a reasonable doubt, that absent the prosecutor's comments, the jury could have found the defendant guilty. This goes beyond a finding of sufficient evidence to sustain a conviction.

*Id*. (internal citations omitted).

¶16. In analyzing this language in ***Spicer***, we find we should have employed the term "would" instead of "could."[7] Thus, to meet the second prong of the test, we hold that it must be clear beyond a reasonable doubt that, absent the prosecutor's inappropriate comments, the jury <u>would</u> have found the defendant guilty. This, of course, amounts to a harmless-error analysis, and is the analysis to be used for the second prong of the ***Spicer*** test.

---

[7]In ***Spicer***, we actually intended the State's burden to be difficult. We stated that we have "cautioned against using harmless error analysis to 'transgress the rules of fair argument that are repeatedly promulgated by this Court'**."** *Id. citing* ***Payton***, 785 So. 2d at 271.

¶17. In this case, we find, as did the Court of Appeals, that both threshold questions must be resolved in favor of Brown. His counsel repeatedly objected, and we find nothing whatsoever in the record which indicates that he invited the inappropriate comments.

¶18. We also agree with the Court of Appeals that the first prong of the *Spicer* test is met. McCullouch's remarks were indeed improper. We now address the second prong, using a harmless-error standard.

¶19. We first note that this case is far more egregious than *Payton*, which we reversed. In *Payton*, 785 So. 2d at 268 the prosecutor made the mistake only once,[8] and the evidence of the defendant's guilt included the testimony of three accomplices and several other witnesses.

¶20. By contrast, in the case sub judice, McCullouch violated the rules five times and, in the process, attempted to mislead the trial judge as to the prevailing law. Furthermore, the evidence against Brown was hardly overwhelming. He was convicted primarily on the testimony of the victim's girlfriend, Latoya Carter, who claimed she saw someone who looked like Brown outside the window with something shiny in his hand. However, in her hand-written statement to police on the day of the incident, Carter made no mention of Brown, stating only that she saw "someone" outside the window. In a later statement, typed by one of the police officers, Carter stated that Brown was the person she saw. However, she also stated elsewhere in the statement that "a shot went off and Ernest [the victim] fell to the floor I ran to the other room. Ernest told me to go and see who it was and I told him no."

---

[8]Also unlike today's case, the defense counsel in *Payton* failed to object to the prosecutor's "send-a-message" statement to the jury. *Peyton*, 785 So. 2d at 270. This Court has stated, however, that "if the argument is so 'inflammatory' that the trial judge should have objected on his own motion the point may be considered." *Gray v. State*, 487 So.2d 1304, 1312 (Miss.1986)(citing *Griffin v. State*, 292 So. 2d 159, 163 (Miss. 1974)).

9

This is a curious statement, given that the trial testimony was that both Ernest and Carter identified the person prior to the shot.

¶21. There were numerous other contradictions in Carter's testimony, as well as in the testimony of the victim, Ernest Moore. We do not point out these contradictions to say there was insufficient evidence for a jury to convict Brown. Rather, we focus on this testimony to demonstrate that the evidence against Brown was not overwhelming; and certainly not enough so to overcome the prejudice engendered by McCullouch's numerous inappropriate statements to the jury during closing argument. Thus, we hold that McCullouch's numerous inappropriate statements to the jury do not constitute harmless error and, due to prosecutorial misconduct, Brown's conviction must be reversed.

¶22. We turn now to the Court of Appeals' order requiring McCullouch to reimburse Washington County for its payment of the costs of appeal.

**II.**

¶23. In its Petition For Writ of Certiorari, the State informs us that the Court of Appeals "issued an opinion affirming Brown's conviction and sentence, but assessing costs of the appeal to Assistant District Attorney Brad McCullouch." We find this statement is not fully supported by the record.

¶24. It is true enough that, within its opinion, the Court of Appeals stated: "We hold that the prosecutor Brad McCullouch be personally assessed with the costs of this appeal." However, in the next sentence, the court stated: "As such, we hold that McCullouch is ordered to reimburse Washington County for such costs within thirty days of the issuance of

10

the mandate." Furthermore, in the disposition of the case at the conclusion of the opinion, the Court of Appeals stated:

> THE COSTS OF THIS APPEAL <u>ARE ASSESSED TO WASHINGTON COUNTY</u>, AND THE COURT ORDERS THAT THE PROSECUTOR BRAD MCCOLLOUCH, INDIVIDUALLY, SHALL REIMBURSE WASHINGTON COUNTY FOR ALL COSTS OF THE APPEAL WITHIN THIRTY DAYS OF THIS MANDATE.

(Emphasis added). Furthermore, the Court of Appeals made it clear that it drew its authority to require McCullouch to reimburse Washington County from our prior cases which speak in terms of sanctions. For instance, citing **Livingston v. State**, 525 So. 2d 1300, 1308 (Miss. 1988), the Court of Appeals stated that "[f]or approximately twenty years, the appellate courts of this state have warned that prosecutors may be sanctioned for such conduct." **Brown**, at *15. Citing **Payton v. State**, 785 So. 2d 267, 271 (Miss. 1999), the Court of Appeals stated that such punishment "includes sanctions at the trial court level as well as the appellate level." **Id**. at *16.

¶25. Because of the ambiguity of the question, that is, whether the Court of Appeals intended to tax McCullouch with costs or sanction him; and because the authority for taxing costs is different from the authority to sanction an attorney, we shall address both possibilities.

*Taxation of costs*

¶26. Taxation of costs on appeal is governed by Rule 36 of the Mississippi Rules of Appellate Procedure, which states:

> (a) To Whom Allowed. Except as otherwise provided by law, if an appeal is dismissed, costs shall be taxed against the appellant unless otherwise agreed by the parties or ordered by the Supreme Court or the Court of Appeals. If a

11

judgment is affirmed, costs shall be taxed against the appellant unless otherwise ordered. If a judgment is reversed, costs shall be taxed against the appellee unless otherwise ordered. If a judgment is affirmed or reversed in part, or is vacated, costs shall be allowed only as ordered by the court which decided the case.

(b) Costs For and Against the State of Mississippi. Costs may be awarded for or against the State of Mississippi or any of its agencies, or officers, or political subdivisions unless otherwise provided by law.

¶27. We agree with the State that, where an appeal is decided by an appellate court, subsection (a) of *Rule 36* provides only for the assessment of costs against the appellant or the appellee, "unless otherwise ordered." And we view the "otherwise ordered" language as authority, under appropriate circumstances, to tax part or all of the costs of appeal to the winning party. Subsection (b) simply provides that the State of Mississippi "or any of its agencies, or officers, or political subdivisions" are fair game for costs. But it says nothing of taxing costs to any of these entities outside their official capacities. Furthermore, the provision presupposes that such official entities are parties to the litigation.

¶28. We are provided no citation of authority for the proposition that an appellate court's power to assess the costs of appeal *pursuant to Rule 36* extends beyond the parties to the litigation. Thus, because McCullouch, in his individual capacity, was not a party to the litigation, Rule 36 provides no authority for taxation of costs against him, personally.[9]

_____

[9]We parenthetically point out that Mississippi Constitution article 14, section 261, provides: "The expenses of criminal prosecutions shall be borne by the county in which such prosecution shall be begun; and all fines and forfeitures shall be paid into the treasury of such county. Defendants, in cases of conviction, may be taxed with the costs."

*Sanctions*

¶29.    If we read the Court of Appeals' action to be a sanction, then the salient question is whether the Court of Appeals had authority to sanction McCullouch, individually, for his inappropriate conduct before the Circuit Court of Washington County.

¶30.    The Court of Appeals'[10] authority to sanction is governed by several of the Mississippi Rules of Appellate Procedure, none of which are applicable here.[11]  Rule 2(a) allows the Court of Appeals to dismiss an appeal where certain procedural requirements are not followed.  This rule is inapposite to this case, as McCullouch's conduct is unrelated to procedural requirements for prosecuting the appeal.  Rule 2(b) allows the Court of Appeals to issue sanctions for failure "to comply with these rules or any order issued pursuant to these rules."  Such is not the case here.  Rules 28(k) and 40(c) do not apply, since they allow sanctions for disrespectful language in a party's brief or motion for rehearing.  Rule 38, which allows an award of sanctions for frivolous appeals in civil cases, also is inapplicable.

¶31.    Thus, we find no authority for the Court of Appeals' order of sanctions against McCullouch personally.

¶32.    In its majority opinion, the Court of Appeals cited several cases which it felt stood as authority for the direct imposition of sanctions by the Court of Appeals against McCullouch. *See e.g.* **Payton v. State**, 785 So. 2d 267, 271 (Miss. 1999).  To the extent **Payton** and other cases suggest that sanctions should be assessed against prosecutors personally, we hold that

---

[10]The Supreme Court has constitutional authority to sanction attorneys which exceeds the authority of the Court of Appeals.  *See e.g.* **Broome v. Mississippi Bar**, 603 So. 2d 349 (Miss. 1992).

[11]See generally Munford, Mississippi Appellate Practice, *Penalties and Sanctions Against Parties*, ¶¶ 19.1-19.4 (October 1, 2006).

13

– because the offending conduct occurred in the trial court – the trial judge must assess whether sanctions are appropriate.[12]

¶33.    We find that Circuit Judge Betty Sanders displayed exceptional judicial restraint and temperment in response to McCullouch's inappropriate behavior which, we emphasize, took place in her courtroom, not here.  Thus, we decline to inquire behind her decision not to sanction McCullouch.

**CONCLUSION**

¶34.    Eleven years ago, addressing recalcitrant prosecutors who stubbornly continued to use "send-a-message" arguments, Justice Banks stated that "it is high time that the bench and bar take seriously our admonitions about such improprieties. Harmless error analysis should not be considered as a license to transgress the rules of fair argument that are repeatedly promulgated by this Court." *Wells v. State*, 698 So. 2d 497, 519 (Miss. 1997).  (Banks, J., concurring in part and dissenting in part).

¶35.    We find considerable prejudice resulted from McCullouch's inappropriate statements to the jury, and we are unable to say, beyond a reasonable doubt, that such prejudice was overcome by the evidence.  We therefore reverse Brown's conviction and sentence and we remand this case to the trial court for a new trial consistent with this opinion.

¶36.    We further find that the Court of Appeals was without authority either to assess the costs of appeal to McCullouch personally, or to sanction him for conduct which took place

---

[12]Chief Judge King articulated this position in writing for the Court of Appeals dissent. Judge King also noted that this Court in ***Northern Electric Company v. Phillips***, 673 So. 2d 1384, 1385 (Miss. 1996),  held that the discretion inherent within the rule is limited by a presumption that costs are awarded to the party prevailing on appeal.

14

outside the Court of Appeals. We therefore reverse the Court of Appeals' order requiring McCullouch to reimburse Washington County for the costs of appeal.

¶37. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CIRCUIT COURT OF WASHINGTON COUNTY IS REVERSED AND REMANDED.**

**SMITH, C.J., WALLER, P.J., CARLSON AND LAMAR, JJ., CONCUR. GRAVES AND RANDOLPH, JJ., CONCUR IN RESULT ONLY. DIAZ, P.J., CONCURS IN PART AND IN RESULT AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

**EASLEY, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶38. I concur with the Court's finding that the Court of Appeals was without authority either to assess costs or to sanction the prosecutor in this case. I dissent from the majority's decision to reverse and remand Brown's conviction, therefore I write separately.

¶39. I have serious difficulty with this Court's decision to reverse Brown's conviction. To begin, this Court granted certiorari at the request of the State, not the defendant, who neither participated in, nor responded to this petition. The Court has now taken upon itself, by what it says is in the interests of justice and economy, to reverse Brown's conviction, at the request of no one. This decision smacks of jurisdictional expediency by means of inflated judicial supremacy.

¶40. Since this Court also is remanding this case for a new trial, the question now becomes does the State have the authority to retry Brown. *See generally **United States v. Dinitz***, 424 U.S. 600, 96 S. Ct. 1075, 47 L. Ed. 2d 267 (1976) (the important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of prosecutorial error). Assuming that the Double Jeopardy

15

Clause does not bar the State's right to retrial, and Brown is once again convicted, and assuming there appears in the record subsequent to the first trial events to justify an increased sentence, does the circuit court have the authority to enhance Brown's already lenient sentence? *North Carolina v. Pearce*, 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969). And finally, assuming that such a scenario comes to fruition, and if thereafter on direct appeal this Court or the Court of Appeals is unwilling to interfere with the trial court's jurisdictional sentencing authority, how is the reviewing court going to respond to what should be Brown's only argument: I did not ask the Supreme Court to reverse my case.

¶41. I also take issue with the Court's effort to keep *Spicer* in good standing for all future cases past this one, by placing with the victims in this case–Latoya Carter, especially–and the evidence provided by both, a basis for anchoring its reasoning why this case must be reversed. *Spicer v. State*, 921 So. 2d 292 (Miss. 2006). I gave considerable thought to making the entire record part of my dissent; and if I believed that it would be read closely by all, I would have. However, I can point out enough of the overwhelming evidence within it without doing so.

¶42. While the Court may be satisfied with the Court of Appeals' summation of the facts in this case, I am not. The recitation provides too general, too incomplete an account of what took place in this matter, most especially for what is at stake here.

¶43. Approximately two to three weeks before the May 2, 2003, Friday-evening incident, a fight broke out between the defendant Brown and Richard Chaney in the yard of the residence at 115 West Second Street in the town of Leland; the same residence where the shooting would later take place. The altercation was the result of Richard having confronted

16

Brown with an accusation that Brown had stolen Stephanie Moore Chaney's wallet while she was away in jail. Stephanie is Richard's wife.

¶44. After Brown picked himself up off the ground, he walked toward his godmother's car, where she sat waiting for him. Brown told his godmother to pop her trunk so he could get a gun. She said no, and ordered him to get in the car. Brown pointed his finger at Richard and told him he was a dead man. Brown got in the car, and the two then drove straight to the Leland Police Department where Brown filed a simple-assault charge against Richard. Weeks later, shortly after the May 2 shooting incident, Richard was arrested on that charge (more on that later).

¶45. Following the day of the fight, approximately one week before the May 2 shooting incident, the Leland Police received the first of multiple calls from Mary Simelton about an individual prowling around her house at 115 West Second St., Apt. A. Mrs. Simelton, the mother of Stephanie Moore Chaney, Whitney Moore, Ramonda Moore, and Earnest Moore, said that her daughter Whitney heard noises outside one of the windows of the house. Mrs. Simelton then went to the window, peeked out, and saw an individual run off. She told the police that the individual was Kenneth Brown. Mrs. Simelton testified that after the police left, she again heard a noise outside the window, which sounded like someone raking his hand across the screen. Testifying again, this time on rebuttal following the defense's case, Mrs. Simelton stated that days before the May 2 shooting incident, she had received a phone call from her daughter, Ramonda. Ramonda, the mother of the Brown's child, was Brown's girlfriend at the time. Mrs. Simelton told the jury that Ramonda had called to warn her,

17

telling her to get everybody out of the house because Brown was acting crazy, saying that he was going to shoot up in the house and then burn it down to the ground.

¶46. Ramonda, who originally was slated as a witness for the State, was removed as its witness after she arrived at the courthouse the day of the trial, having ridden with Brown, and having then informed the prosecutors that she had not called her mother to warn her. Ramonda did, however, testify for the defense, telling the jury during cross-examination by the State that she did not call her mother, but personally went over to her mother's house a couple of days before May 2 and warned her that Brown had disappeared and was still very angry about the fight with Richard.

¶47. At 8:19 p.m. on May 2, 2003, Officer Jeff Nassar of the Leland Police Department received a call from his dispatcher about an incident at 115 West Second Street. Officer Nassar arrived at the scene at 8:21 p.m. There he found Earnest Moore, with his hand bleeding, in an excited, aggravated, and angry state. According to Officer Nassar, Earnest stated that he heard a noise outside his window, and went to the window to see who was there. As he looked out, he saw a black male with a light complexion, wearing a white T-shirt, standing outside the window. He said he recognized the subject as being Kenneth Brown. Earnest said that he heard gunshots, then felt a stinging in his hand, which thereafter went numb. He then turned and ran back into the house. Officer Nassar looked around inside the house and found a bullet hole in the window. From there, he traced it to where Earnest had been standing inside the house. He then found another bullet hole in the wall, which led to another hole in the bathroom wall. The officer went into the bathroom and recovered a .380 caliber bullet projectile from the floor. The officer also testified that upon

18

learning at the scene that Brown was a student at Mississippi Valley State, both campus security at the college and the Indianola Police Department (Brown had been staying there with his godmother) were immediately notified to be on the lookout for Brown.

¶48. A neighbor told Officer Nassar that a white Cadillac was parked in front of her house. She said it had departed at a high rate of speed shortly before the police arrived. Investigator Byron Vaughn, also with the Leland Police Department, testified that the day Brown and his godmother came to the police station to file a simple assault charge against Richard, they had arrived in a white Cadillac. The defendant and his girlfriend, Ramonda, testified that the godmother did not own a white Cadillac. The godmother did not testify.

¶49. Mrs. Simelton, this time testifying during the State's case-in-chief, said that Earnest called her on the phone saying, "Momma, I've been shot . . . . Kenny done shot me." Mrs. Simelton said that when she got to the house, Latoya told her he was around the window.

¶50. Brown was arrested by the Leland police the following Sunday. While in jail, Richard was arrested for the simple assault charge filed by Brown the day of the fight. Richard testified that Brown was bragging in the jail that he had shot Earnest (Richard's brother-in-law). Richard testified that he tried to get the jail staff to place him in the same cell with Brown. They did not.

¶51. For Brown's defense, his attorney vigorously challenged the State's proof. As any good defense attorney would do, Brown's attorney called into question the State's lack of physical evidence: no weapon, no fingerprints, and no DNA found at the crime scene. The defense also brought to the jury's attention the fact that some of the family members (including those who did not testify) had criminal backgrounds and bad reputations, calling

19

into question the credibility of the State's witnesses. The defense seized, though stealthily, upon both Latoya's handwritten statement and the one typed thereafter by a police officer (more on this infra). Finally, the defense attempted to set forth Brown's alibi defense by blaming the State for creating a lack thereof.

¶52.    When the Court of Appeals reviewed this case, the first prosecutorial error it noted was the prosecutor's comment at trial that Brown's three alibi witnesses did not show up to testify on his behalf. The trial court sustained the defense's objection but overruled the request for a mistrial. The trial court gave a limiting instruction, reminding the jury that the court rules on the law and the jury decides the facts of the case. The court then informed the jury that the prosecutor had improperly commented on the fact that the defendant had produced no alibi witnesses. In my opinion, this was error.

¶53.    Brown took the stand and testified that he had provided the police with three names and that the police had never contacted them. He had also told the police that he would try to locate them "so as to get them to come in and give their statements." Investigator Vaughn testified that they were unable to locate any of alibi witnesses. However, the defendant testified that his witnesses had called his lawyer, but were told that he could not take a statement over the phone.

¶54.    The rule regarding such situations is clear: The failure of either party to examine a witness equally accessible to both is not a proper subject of comment before the jury by either of the parties. **Heafner v. State**, 17 So. 2d 806, 808 (Miss. 1944). Yet the failure of a party to produce such a witness who was equally accessible to both parties "not only gives rise to a legitimate inference that its production would have resulted unfavorably to him, but

20

also rightfully entitles counsel for the opposing party, in the course of his argument to the jury, to comment upon his adversary's failure to have produced such evidence." ***Brown v. State***, 27 So. 2d 838, 841 (Miss. 1946) (overruling ***Brown v. State***, 98 Miss. 786; 54 So. 305 (1910)). In this case, the record does not indicate where these individuals were at the time of trial. Nevertheless, Brown put before the jury what he claims was the State's failure to contact his three alibi witnesses. When he admitted that his attorney had talked to them by telephone without making any further attempt to subpoena them or procure their statements, he threw the door wide open. Not only was the State allowed to respond, it was, as our adversary system surely envisions, required to bring to the jury's attention that it was permitted to make an inference from the fact that the defendant did not bring any of the three alibi witnesses into court.

¶55. In my opinion, even without the eyewitness testimony of Latoya Carter and Earnest Moore, the weight of the evidence against Brown, though circumstantial, was overwhelming. Any reasonable juror, after listening to the presented evidence in this case, could determine that this defendant had some kind of ongoing beef with this family. And from that, along with all the other factual inferences and deducements therefrom, could infer that Brown had fired a weapon into the family's house in the early evening of May 2. The prosecutor did not even have to stand and sum it up for them.

¶56. This, of course, was not the entire trial. Latoya and Earnest did testify to what they saw; and two statements, one written in Latoya's hand, the other typed by a police officer after advising her to read over her original, handwritten account to make sure the typed

21

statement was complete, were entered into evidence by the defense. Let us see how much damage was done.

¶57. We will begin first with Earnest Moore, who testified last for the State. The testimony he provided, which appears to be ignored by this Court, was in pertinent part as follows:

Q. Do you remember the night of May 2, 2003? What happened that night?
A. Yes, sir.
Q. What happened?
A. Okay. It was me and my girl Latoya Carter. We were in the room, and me and her we were just playing around. She heard a click. She heard a click. So she jumped up. She jumped up off me, and she say, Earnest, what Kenny doing around your window, just like that. And I was like for real.
Q. Did you go look out the window at that point?
A. At that time?
Q. Did you go look out the window when she said that?
A. Did I go? Yes, sir.
Q. Did you see anything?
A. Okay. When she said Kenny–she said Kenny around your window, just like that. So I said, for real, like that. So I got up real easy. So when I looked out the window, you know what I'm saying, that's who I seen, you know what I'm saying. So as I was seeing him, that's when the gunshot came up through the window.
Q. Did it cause you bodily injury?
A. Yeah. It shot me in my left hand.
. . .
Q. What did you do at that point?
A. I just got down on the floor and got low when that gunshot came through there. I just got low like the Army, you know, just got low. I started crawling, and then, you know, I went and called the paramedics and ambulance to myself.
Q. Can you identify the person who shot you?
A. Yes, sir.
Q. Please do.
. . .
A. Right there (Pointing). Kenny Brown.
. . .
Q. I'm saying are you sure it was him?
A. Yes, sir, I seen his face.

¶58.    The defense did not cross-examine Earnest.  For purposes of this opinion, we turn back in the record to Latoya Carter's testimony, who testified first for the State.  Latoya was seventeen at time of the shooting, and by the time of trial she was no longer with Earnest.  Her testimony in pertinent part was as follows:

Q.  I want to take you back to May 2, 2003.  Do you recall that night?
A.  Yes, sir.
Q.  Along about 8 o'clock what were you doing, and who all was in the house?
A.  It was me and Earnest.  We were in the bedroom at the time, and I heard a noise like a clinking sound.  So it kind of bothered me.  So I kind of jumped up quick, and I told–well, Earnest told me to make sure the door was locked.
Q.  Why were y'all worried about the door being locked?
A.  Because I heard the noise, and it kind of scared me.  On my way to make sure the door was locked, I heard another clinking sound, and so that made me stop, and then I heard someone walking.  Well, I heard the leaves around the house.  So I stopped and looked out the blind, and I said Earnest, I said - -
Q.  Were you in his bedroom?
A.  No, sir.
Q.  Okay.  Where was Earnest?
A.  Earnest was still in the bedroom.
. . .
Q.  What did you say?
A.   I said Earnest, I said, what is Kenny doing standing at your bedroom window.  That's when he said, who.  And I said, your sister's boyfriend.
Q.  And who is that?  Who is the sister's boyfriend?  I mean who is the sister?
A.  Ramonda Moore.
Q.  She was kind of seeing - -
A.  Kenny Brown.
Q.  What did he say?
A.  He asked who, and then I told him to come out of the room.  I said, come out of the room because they standing right in front of you.
. . .
Q.  So you saw him and you said to Earnest - -
A.  I said, Earnest.  I said, come out of the bedroom.  I said, Kenny–I said, what is Kenny doing standing outside your window, like that, and he said who.  I said, your sister's boyfriend.  That's when he came out, and then he said who, and then I said Kenny.  That's when he looked, and then he said that is Kenny.  That's when the gun shot went off.
Q.  Did you see Kenny with the gun?
A.  Yeah.

23

Q. What kind of gun did it look like? Can you remember?
A. I know it was silver. It was kind of silver. I seen the side when he was holding it from the side. I seen the side of it.
Q. What did you do when that happened?
A. That's when I told Earnest to come out of the room.
Q. I mean after he got shot.
A. Me and him, we ran into the kitchen part of the house.
Q. Do you have a child?
A. Yes, sir. But my aunt, she had just, not even, not even a few minutes before that -
Q. It's all right.
A. (Witness crying.)

BY THE COURT: Are you all right, Ms. Carter? Are you going to be able to continue?

BY THE WITNESS: (Nodding Head.)

Q. So, Latoya, you were telling me something about where you kept the - - or that Earnest would sometimes hold that baby?
A. Yes, sir.
Q. Tell the jury what you were saying.
A. I said that normally Earnest would be holding the baby, but when my aunt came, she said that something just told her to come and get him, but she didn't know what it was. So she just came right away, and not even a few minutes after she left that happened.
Q. Are you sure it was Kenneth?
A. Yes, sir.
. . .
Q. Now, after you saw this, did the ambulance come, or what happened in other words?
A. Earnest, he crawled into the bedroom, and he called 911, and the ambulance and the police arrived.
Q. Did you tell the police?
A. Yes, sir.
Q. Did you tell the police who did it right then?
A. Yes, sir.
Q. Was there any doubt in your mind?
A. No, sir.
Q. Have you been scared since then?
A. Yes, sir.
Q. It's all right.

24

A. (Witness crying.) I had went about five or six months after that I couldn't get any sleep.

. . .

Q. Did you see what he had on?

A. A white T-shirt and some blue jeans, long pants.

Q. Did you see in what direction he went after the shooting?

A. No, sir.

Q. Did you see where the bullet went?

A. Yes, sir.

Q. Where did it go once it got into the house?

A. When it went through his hand - - he was like this, and it went through when he did that, and it came through, and it went through the wall here (pointing to an exhibit), and it went through the bathroom wall and hit the other side of the bathroom wall, and it stopped.

. . .

¶59. The following exchange, in relevant part, took place during cross-examination by the defense, and depicts what was probed into regarding Latoya's statements to the police:

Q. You said that there were - - you heard someone walking in the leaves?

A. Yes, sir.

Q. And this was May 1st.

A. I'm not sure. I'm not sure.

Q. You're not sure what day this happened?

A. No, I'm not.

Q. Do you know what day of the week it was?

A. It was a Friday or a Saturday. I'm not really sure.

. . .

Q. Did you give a statement to the police?

A. Yes, sir.

Q. And how did you go about doing that? Did you just tell them?

A. They came to the hospital. When we went to the hospital, they came and got everybody to come and make a statement.

Q. Did you talk to them, though, or did you write it down?

A. I talked to them. Well, they told me to write down what happened.

Q. Did you do that?

A. Yes, sir.

. . .

Q. I want you to look at that, and tell me if that's the statement you gave to the police.

A. Yes, sir.

Q. Okay. Did you type out any statement to the police?

A. He typed it out after I wrote it.

Q. He typed it out after you wrote it?

A. Yes, sir.

. . .

Q. Did you tell them anything else besides that statement?

A. No, sir.

Q. Ma'am, I'm sorry?

A. No, sir.

Q. You didn't.

. . .

Q. Have you ever seen that before?

A. This is the statement that he typed out.

Q. The statement that the policeman typed out?

A. Yes, sir. It was going from the statement that I wrote down.

Q. Okay. You said it was going from the statement that you wrote down?

A. Yes, sir.

Q. Is there more to this statement than this one?

A. I don't - - no, sir.

Q. So everything that's here - -

A. Yes, sir.

Q. And everything that's in here is in here?

A. Yes, sir.

Q. Okay.

. . .

(EXHIBITS D-1 AND D-2 RECEIVED INTO EVIDENCE.)[13]

---

[13] The following is Latoya Carter's handwritten statement; the record contains only a copy of the original, a few of the words are cut off by the margin:

> On the night of May the 1st I Latoya and Ernest (sic) L. Moore was [in] the house in our bedroom and Ernest asked me to go and make sure the door was [lo]cked and as I got up I [h]eard a clicking sound, so I told Ernest I heard something, but I went on to lock the door and I heard the sound [a]gain that's when I looked out the window and saw someone [pu]lling on something so I called Ernest out of the room and he came and [loo]ked out the window and <u>I said it looks like he's holding a gun</u>, and I said [m]ove from the window baby and that's when he shot threw (sic) the window and [s]hot Ernest in the hand. (Emphasis added).

The typed statement:

> On the night of May the 1st. I Latoya and Earnest L. Moore was in the house

26

Following entry of the two exhibits into evidence, and without touching any further upon the discrepancies, the defense wisely moved on to unrelated matters–tactically and effectively leaving the lack of compatibility between the two statements to be questioned and weighed by an appellate court. Brilliant. The following was then heard during the State's redirect examination of Latoya:

> Q. Let me ask you this. How many times did you talk to the police about this?
> A. One.
> Q. Did you say anything to them when they got there out to the house?
> A. They were more concerned about Earnest.
> Q. Did you tell them right then who did it?
> A. Yes, sir.
> Q. So you spoke to them at the house a little bit. Did you speak to them at the hospital a little?
> A. No. Only when he came to take us to the police station.
> Q. Okay. Then you went and gave a statement?
> A. Yes, sir.

---

in our bedroom and Earnest asked me to go and make sure the door was locked and as I got up I heard a clicking sound, so I told Earnest I heard something but I went on to lock the door and I heard the sound again that's when I looked out the window and saw someone pulling on something so I called Earnest out of the room and he came and looked out the window and <u>I said it looks like he's</u> <u>holding a gun</u>, and I said move from the window baby and that's when he shot threw (sic) the window and shot Earnest in the hand. <u>See I was looking</u> <u>out</u> the window first and he said who is it and I said it looks (sic) your sister's boyfriend Kenneth Brown. That is when he looked out the window and I told him to move. It was about 8:00 or so and Kenneth was at Earnest room and Earnest does not have a blinds up but he does have a dresser near the (sic) and Kenneth was standing the (sic) TV light and I went to the window and saw his face. Kenneth was standing shaking or doing something with what he had in his hand and I know it looked silver so I told Earnest to move from the window. After I told Earnest to move from the window a shot went off and Earnest fell to the floor I ran to the other room. <u>Earnest told me to go and see</u> <u>who it was and I told him no.</u> Earnest got on the floor scooted across the floor and called the police. I did not know Earnest was hit until he called his mother. Richard his brother-in-law came in and that is when Earnest said I been shot. We then called the ambulance. (Emphasis added).

27

Q. Now, you were telling me earlier on direct examination something about you saw a gun, and in this handwritten statement, you didn't make a mention of the gun. I mean, I know how it is. Sometimes you remember things. And then in this typed statement - - did you type this statement?
A. No, sir.
Q. Okay. Did you sign this statement?
A. Yes, sir.
Q. Is everything in both statements true?
A. It should be in that statement.
Q. It is, but this one ends. The handwritten statement ends up in here. Then there's some stuff about the gun. Did you ever tell the police about the silver gun?
A. Yes, sir.
Q. When did you tell them that?
A. After I finished, he asked me - - he told me to read over it and make sure that I had everything in there before he typed it.
Q. Were there some things you left out?
A. Yes, sir.
Q. Like the gun?
A. Yes, sir.
Q. And then he typed it all down?
A. Yes, sir.
Q. And then you read it?
A. Yes, sir.
Q. And signed it?
A. And signed it.
Q. Do you have any doubt whatsoever who shot Earnest?
A. No, sir.
Q. Who was it?
A. Kenneth Brown.

¶60.    This is strong testimony, given under oath by both Latoya and Earnest, with natural and perceptible inconsistencies that always occur between testifying eyewitnesses. The Court, however, focuses upon contradictions between Latoya's handwritten statement and the one typed thereafter by a police officer, both taken just hours after the shooting, when Latoya was taken from the hospital to the police station.

28

¶61.   For the sake of thoroughness, I point out that one such contradiction not mentioned was the date. In both statements, Latoya indicated that the incident happened on May 1. The defense certainly did not miss this. Throughout trial, the defense attorney, as did Brown during parts of his testimony, continuously–but subtlely–kept referring to the incident that took place on May 1, a date when he claimed he was with his buddies at the college shooting basketball. Brown even stated that he was in Indianola on May 2, the day after the May 1 incident. The State caught it a few times, and objected. This was fair game, even with all the other testimony that the shooting took place on May 2, due to both of Latoya's statements and her admission while on the stand to not being sure of the date that the shooting happened. Still, such a contradiction was a straight issue of fact for the jury to consider, as were any other differences between the two statements.

¶62.   What this Court seizes upon, however, is Latoya's having not included Brown's name in the first statement. But as far as these eyes are concerned, the only judicial finding that can be made from the fact that Latoya did not mention Brown when she wrote out the first statement, is the fact that Latoya did not mention Brown. Put another way: so what. The reasons for her not having written the name "Kenny Brown" in her first statement could be any. Maybe she did not see him; maybe she felt pressure from the family; maybe Richard told her not to involve the police, that he would take care of it; maybe she has been let down by the system before; maybe she had a premonition, not unlike her aunt's earlier that evening, that something strange would happen years later in the appellate courts, so why bother; or maybe it was because she, like every one of us, is not infallible, and she simply made a mistake.

¶63. Indeed, it is a very difficult process when writing to simultaneously reformulate and communicate a sequential series of past events. Such difficulty increases greatly when having to do so while sitting in a police station just hours after a traumatic experience.[14]

¶64. Regardless, this was solely for the trier(s) of fact to consider. And when weighed with all the additional evidence adduced at trial, and taking into consideration that before Latoya even put pen to paper there was already an all-points bulletin out on Brown, it is not difficult to understand how the jury reached its conclusion. In my firm opinion, if the offending remarks are removed from this record, it remains clear, <u>beyond a reasonable doubt</u>, that there was sufficient evidence for the jury to find Brown guilty of aggravated assault and shooting into an occupied dwelling, and the jury still <u>would</u> have found the defendant guilty.

¶65. I also disagree with the Court's comparison with *Payton*; noting that, unlike here, Payton had strong evidence provided by three accomplices and other witnesses against him. *Payton v. State*, 785 So. 2d 267 (Miss. 1999). I point out that this Court also reversed on the case's lead issue, finding that the trial court erred by denying Payton's motion to sever. *Id*. at 270. The Court's only mention of the evidence provided by his three accomplices was that it severely prejudiced Payton's defense. *Id*. at 267-73.

¶66. Furthermore, the second threshold inquiry set forth in *Spicer* requires all the surrounding circumstances be examined. *Spicer*, 921 So. 2d at 318. I have seen enough trials

---

[14] Although footnote 1 contains the exact language contained within the two statements, it does not provide an accurate depiction of the exhibits themselves. Both are copies of the actual police forms which are identical, in that both provide the same amount of space for any writing to be contained therein. It is worth noting that in Latoya's handwritten statement, she ran out of room with her printing.

in my time to know the purpose that lay behind defense counsel's own comments offered during closing, such as: "Kind of reminds of the police"; "You've got felons . . . . You've got robbers, and I'm not sure what Stephanie (who did not testify) did, but she's a felon too, apparently." Nor did I miss what defense counsel propounded to the venire during voir dire:

> How many of you have ever gotten a speeding ticket, show of hands? How many of you wear your seat belt every time you get in the car? How many of you do it because it's the safe thing to do? How many of you do it and only do it because you're going to get a ticket? Do you feel like maybe that's a little obtrusive? Do you feel like the State has any business telling you whether or not to wear your seat belt?

¶67. Wink-nod tactics such as these deserve a response. The State, charged with the obligation to protect those united together for common benefit and mutual safety, should at least have fair opportunity to argue against any attempt, no matter how skillfully nuanced, to nullify the law. *Cf. **Davis v. State***, 520 So. 2d 493, 494 (Miss. 1988) (the jury has the power to acquit a criminal defendant for whatever reason even though the evidence supports a conviction, and this power is an important part of the constitutional scheme of our criminal law system). Or else, what does this Court mean by the concept, "fair argument." *See **Payton***, 785 So. 2d at 271 (citing ***Wells v. State***, 698 So. 2d 497, 519 (Miss. 1997) (Banks, J., concurring in part and dissenting in part).

¶68. As the record indicates, on the other side of the last bathroom wall, which bounced the bullet-projectile to the floor, lived a women and her four-year-old daughter. This was relevant information brought out during the trial, and it was absolutely appropriate for the prosecutor to point it out.

¶69. The prosecutor's argument did not manipulate or misstate the evidence, nor did it implicate, as was the case in *Payton*, other specific rights of the accused. *Payton*, 785 So. 2d at 267. In my opinion, a weighted belief that remarks such as those made in this case can so easily dissuade our citizens from performing properly in their roles as jurors, suggests judicial elitism.

¶70. Brown received a fair trial with good legal representation, presided over by a respected and experienced trial judge. I am convinced that the twelve members of Brown's jury heeded Judge Sanders's instructions and voted to convict Brown for no other reason than the evidence presented to them showed guilt beyond a reasonable doubt.

¶71. For the aforementioned reasons, I strongly dissent from the majority's decision to reverse Brown's conviction, which–although not asked of this Court–I would affirm. I concur with the majority as to Part II concerning the impermissible costs and/or sanctions assessed against the prosecutor.